BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

CASE NO. 2019080542
CASE NO. 2020040245
CASE NO. 2020010465

THE CONSOLIDATED MATTERS INVOLVING

PARENT ON BEHALF OF STUDENT, AND

UPLAND UNIFIED SCHOOL DISTRICT.

# DECISION

## NOVEMBER 24, 2020

On August 13, 2019, Student filed with the Office of Administrative Hearings, referred to as OAH, a Request for Due Process Hearing in OAH Case No. 2019080542, Student's First Case, naming Upland Unified School District. OAH granted Student's request to amend the complaint in Student's First Case on December 4, 2019.

On January 14, 2020, Upland filed a Request for Due Process Hearing in OAH Case No. 2020010465, Upland's Case, naming Student. On January 16, 2020, OAH granted Upland's Motion to Consolidate Upland's Case with Student's First Case and to continue the due process hearing dates in the consolidated matters, Consolidated Case, to the dates set in Upland's Case.

On February 3, 2020, OAH continued the hearing to April 21, 2020, and on April 8, 2020 OAH continued the hearing to May 12, 2020.

On April 2, 2020, Student filed with OAH a Request for Due Process Hearing in OAH Case No. 2020040245, Student's Second Case, naming Upland.  On April 30, 2020, Upland filed a Motion to Consolidate Student's Second Case and the Consolidated Case.

On May 1, 2020, Student filed a second motion to amend the complaint in Student's First Case.  OAH granted Student's second request to amend the complaint in Student's First Case on May 4, 2020.  OAH rescheduled the due process hearing in the Consolidated Case to begin on June 23, 2020.

On May 4, 2020, OAH granted Upland's Motion to Consolidate Student's Second Case with the Consolidated Case.

On June 17, June 26, July 24, and July 31, 2020, OAH granted Student's requests for continuance.

Administrative Law Judge Kara Hatfield heard this matter by video conference on August 25, 26, and 27, and September 1, 2, 3, 15, 17, 22, 24, and 25, 2020.

Attorney Tania Whiteleather represented Student.  Mother attended all hearing days on Student's behalf.  Student did not attend except while she testified.  Attorneys Christopher Fernandes and Joshua Walton represented Upland.  Anthony Farenga, Upland's Director of Special Education, attended all hearing days on Upland's behalf. Dr. Royal Lord, Program Manager of the West End Special Education Local Plan Area, also attended.

At the parties' request, OAH continued the matter to October 26, 2020, for written closing argument.  OAH granted Student's two additional requests for continuance and ordered the parties to submit written closing arguments by November 9, 2020.  The record was closed, and the matter was submitted on November 9, 2020.

## ISSUES

### STUDENT'S ISSUES

1. Did Upland significantly impede Parent's opportunity to participate in the educational decisionmaking process by failing to explain to Parent why Upland wanted to do additional assessments under an October 19, 2016 assessment plan after having conducted a triennial reassessment in 2015?

2. Did Upland deny Student a free appropriate public education, called a FAPE, by failing to provide Parent prior written notice in response to Parent's October 19, 2016 request for independent educational evaluations?

3. Did Upland deny Student a FAPE in the October 31, 2016 individualized education program, called an IEP, by:

   a. Failing to consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and the need for assistive technology;

   b. Failing to include present levels of performance in all areas of unique need;

   c. Failing to develop appropriate goals based on present levels of performance;

   d. Significantly impeding Parent's opportunity to participate in the educational decisionmaking process by failing to discuss or consider

      private services Student was receiving from Lindamood-Bell, tutoring, and speech therapy;

    e.  Failing to place Student in the appropriate grade level;

    f.  Failing to offer appropriate placement, the least restrictive environment, for the 2016-2017 regular school year and 2017 extended school year; and

    g.  Failing to develop an appropriate post-secondary transition plan?

4. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's October 31, 2016 request for independent educational evaluations?

5. Did Upland deny Student a FAPE by failing to timely respond to Parent's October 31, 2016 request for independent educational evaluations, either by funding them or filing to establish Upland's own assessments were appropriate, in the areas of:

    a.  Neuropsychology;

    b.  Assistive technology; and

    c.  Central auditory processing?

6. Did Upland deny Student a FAPE by failing to timely assess Student, after Parent's October 31, 2016 request, in all areas of suspected disability, specifically:

    a.  Sensory integration praxis;

    b.  Visual motor integration;

    c.  Visual perceptual skills;

    d.  Magnocellular needs;

    e.  The need for vision therapy;

    f.  The need for an interactive metronome; and

    g.  The need for assistive technology?

7. Did Upland deny Student a FAPE by failing to provide Parent legally compliant prior written notice of Upland's November 18, 2016 decision not to provide Student Kurzweil as assistive technology after Upland offered it to Student in the October 31, 2016 IEP?

8. Did Upland deny Student a FAPE by failing until January 2020 to file a request for a due process hearing to obtain a determination from OAH that the October 31, 2016 IEP offered Student a FAPE, after Parent did not consent?

9. Did Upland deny Student a FAPE by failing, before August 21, 2017, and thereafter, to convene an annual meeting to develop an IEP for the 2017-2018 school year and 2018 extended school year?

10. Did Upland deny Student a FAPE by failing to convene an IEP team meeting before August 21, 2017, and thereafter, to review independent assessments by Dr. Stephey and Lindamood-Bell?

11. Did Upland deny Student a FAPE by failing to timely complete assessments to which Parent consented on December 13, 2017?

12. Did Upland deny Student a FAPE by failing to file a request for a due process hearing to obtain OAH authorization to conduct assessments to which Upland contended Parents did not provide consent in December 2017?

13. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's June 6, 2018 request for independent educational evaluations?

14. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's July 26, 2018 request for independent educational evaluations?

15. Did Upland deny Student a FAPE by failing to timely assess Student, after Parent's July 26, 2018 request, in all areas of suspected disability, specifically:

5

    a.  Sensory integration praxis;

    b.  Visual motor integration;

    c.  Visual perceptual skills;

    d.  Magnocellular needs;

    e.  The need for vision therapy;

    f.  The need for an interactive metronome; and

    g.  The need for assistive technology?

## UPLAND'S ISSUES

16. Was Student a parentally placed private school student for the 2017-2018 and 2018-2019 school years and, therefore, not entitled to a FAPE from Upland?

17. Was Student entitled to a FAPE from Upland during the 2017-2018 and 2018-2019 school years after Parents refused to consent to the September 30, 2016, and October 24, 2016 assessment plans?

18. If Upland was obligated to have an IEP in place for Student during the 2017-2018 and 2018-2019 school years, did the October 31, 2016 IEP constitute a FAPE, and continue to be in effect/available to Student through the final date of Student's eligibility for special education and related services?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  All future references to the Code of Federal Regulations are to the 2006 version.  The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and

- the rights of children with disabilities and their parents are protected.

(20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of FAPE, to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  In this consolidated matter, Student bore the burden of proof on Student's claims, and Upland bore the burden of proof on Upland's claims.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was 23 years old at the time of hearing.  Student resided within Upland's geographic boundaries at all relevant times.  Student was initially found eligible for special education in 2000, and in approximately 2001 was found eligible under the

currently defined categories of intellectual disability and speech or language impairment.  As explained in more detail in Issue 1, below, after Student's last triennial evaluation in 2014 and an IEP team meeting in 2015, she was eligible under the categories of specific learning disability and speech or language impairment.

Student turned 18 years old in March 2015.  On July 13, 2015, Mother gave Upland a form Student signed on that date appointing Mother as the holder of Student's educational rights.

## TIMELINESS OF STUDENT'S CLAIMS REGARDING THE 2016-2017 SCHOOL YEAR

Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request.  (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505(*l*).)

### STUDENT'S FIRST CASE

Student's First Case, as originally filed on August 13, 2019, did not contain any claims regarding the 2016-2017 school year.  By her second amended complaint filed on May 4, 2020, Student added claims to Student's First Case related to the 2016-2017 school year.

### STUDENT'S SECOND CASE WAS BASED ON A PRIOR 2018 CASE AND A TOLLING AGREEMENT

On October 30, 2018, Student filed a complaint in OAH Case No. 2018110087, the Prior 2018 Case, naming Upland.  On May 6, 2019, the parties entered a tolling agreement in which Upland agreed to allow Student to refile with OAH the claims stated

in the Prior 2018 Case within 30 days of the conclusion of a pending case Student filed in the United States District Court.  The same day, Student withdrew the Prior 2018 Case without prejudice.

Student's Second Case, filed on April 2, 2020, pursues claims commencing October 31, 2016, based upon the May 2019 tolling agreement with Upland.  The complaint in Student's Second Case was identical to the complaint in the Prior 2018 Case.

## UPLAND'S MOTIONS TO DISMISS

On or about April 24, 2020, Upland moved "to Determine the Relevant Timeframe of the Issues for Due Process Hearing," effectively a motion to dismiss all claims in Student's Second Case.  Upland asserted the two-year statute of limitations prohibited Student from pursuing in April 2020 claims relating to events in the 2016-2017 school year, including Upland's offer of placement and services in the October 31, 2016 IEP. Upland argued only that tolling agreements should not be recognized by OAH.

On or about May 8, 2020, Upland moved "to Dismiss [enumerated issues] and Limit the Timeframe of [other enumerated issues]" regarding the claims in the second amended complaint in Student's First Case concerning the 2016-2017 school year, effectively a motion to dismiss the claims in Student's First Case regarding the 2016-2017 school year.

On May 18, 2020, OAH denied Upland's two motions to dismiss, without prejudice to raising the statute of limitations as a defense at the due process hearing on the consolidated cases.

9

In its written closing argument, Upland renewed its assertion Student's claims regarding events before August 12, 2019, were barred by the statute of limitations, notwithstanding the May 2019 tolling agreement.  Upland argued only the two statutory exceptions to the two-year statute of limitations stated in title 20 United States Code section 1415(f)(3)(D) allow claims beyond the two-year statute of limitations, and Student failed to allege any facts supporting either exception in her complaints, and further, failed to prove that either statutory exception applies.

There is no explicit prohibition on tolling agreements for claims arising under the IDEA or related sections of the California Education Code.  Therefore, the hearing proceeded on Student's claims as agreed to by the parties on or about May 6, 2019, and this Decision addresses Student's claims regarding the 2016-2017 school year, but only those claims stated in Student's Second Case.  (*Student v. Savanna School Dist.* (November 16, 2017) OAH Case No. 2017100226 (Order Granting in Part and Denying in Part District's Partial Motion to Dismiss); but see *Student v. Long Beach Unified School Dist.* (2019) OAH Case No. 2018050736; orders and decisions rendered in special education due process hearing proceedings may be cited as persuasive but not binding authority in subsequent proceedings (Cal. Code Regs., tit. 5, § 3085).)

Student's May 2020 second amended complaint added new claims to Student's First Case.  Some of those new claims were duplicative of those stated in Student's Second Case regarding the 2016-2017 school year, but some of the new claims were entirely different claims regarding the 2016-2017 school year, which Student had never before alleged.  Through the second amended complaint in Student's First Case, Student attempted to smuggle in claims related to the October 31, 2016 IEP and 2016-2017 school year that were not in the Prior 2018 Case, refiled in Student's Second Case.  Specifically, only Issues 1, 3a, 3d, 3f, and 5 were in the Prior 2018 Case, refiled in

Student's Second Case.  However, Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 were not in the Prior 2018 Case, refiled as Student's Second Case.  Those claims, related to the 2016-2017 school year, were stated for the first time in the second amended complaint in Student's First Case.

The May 2019 tolling agreement specifically stated "the issues, claims, complaints, contentions, causes of action, remedies, damages, liabilities, and/or rights, of any kind or nature that may be raised in the Re-Filed OAH Complaint are limited to those cited in the original OAH Complaint filed on October 31, 2018 [*sic*], and which remain unresolved after final resolution of the District Court Complaint."  Student cannot bootstrap onto preserved claims additional claims from generally the same time period that were not previously asserted.  Therefore, while OAH will decide the specific claims regarding the 2016-2017 school year Student and Upland contracted to preserve by the May 2019 tolling agreement, Student's attempt to expand her claims beyond the specific claims stated in Student's Second Case was improper.

Student's claims in Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 are untimely.  They are not covered by the May 2019 tolling agreement, and therefore are barred by the two-year statute of limitations.  Although Student's new claims in the second amended complaint in Student's First Case might "relate back" to the original filing date of Student's First Case, August 13, 2019, the new claims concerning the 2016-2017 school year are all based on alleged acts or omissions of which Mother was aware prior to August 13, 2017, and as such, are outside the two-year statute of limitations.  (*M.M. & E.M. v. Lafayette School Dist.*  (N.D. Cal., Feb. 7, 2012 Nos. CV 09– 4624, 10–04223 SI) 2012 WL 398773, ** 17–19), affd. in part & revd. in part (9th Cir. 2014) 767 F.3d 842, 858-859; *Alexopulous v. San Francisco Unified School Dist.* (9th Cir. 1987) 817 F.2d 551, 555.)

Therefore, Student's Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 are dismissed because they are barred by the statute of limitations and unpreserved by the May 2019 tolling agreement.

## ISSUE 1:  SUFFICIENT INFORMATION PROVIDED TO PARENT REGARDING ADDITIONAL ASSESSMENTS UNDER SEPTEMBER 30, 2016 AND OCTOBER 19, 2016 ASSESSMENT PLAN

Student contends Upland failed to provide Mother sufficient information to consent to Upland's triennial evaluation assessment plan, thereby significantly impeding her opportunity to participate in the educational decisionmaking process.

Upland contends it did not significantly impede Mother's opportunity to participate in the educational decisionmaking process because it provided her legally sufficient information regarding the purpose and types of assessments it proposed to conduct.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.)  Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA.  (20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a), and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.)

In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204; *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000].)

Assessments are required to determine eligibility for special education, and what type, frequency, and duration of specialized instruction and related services are required.  (20 U.S.C. § 1414(a); 34 C.F.R. § 300.303; Ed. Code, §§ 56043(k), 56381, subd. (a).)  A local educational agency must conduct a reassessment at least once every three years, called a triennial reassessment, unless the parent and the agency agree that it is unnecessary.  (20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2); Ed. Code, §§ 56043, subd. (k), 56381, subd. (a)(2).)  The agency must also conduct a reassessment if it determines the educational or related service needs of the child, including improved academic achievement and functional performance, warrant a reassessment.  (20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1); Ed. Code, § 56381, subd. (a)(1).)

To assess or reassess a student, a school district must provide proper notice to the student and his or her parents.  (20 U.S.C. § 1414(b)(1); Ed. Code, § 56321(a).) Parental consent for an assessment is generally required before a school district can assess a student.  (20 U.S.C. § 1414(c)(3); 34 C.F.R. § 300.300(c)(1); Ed. Code,

§ 56381, subd. (f).)  Parental consent is not required before reviewing existing data as part of an assessment or reassessment, or before administering a test or other assessment that is administered to all children, unless before administration of that test or assessment, consent is required of the parent of all the children.  (34 C.F.R. § 300.300(d)(1); Ed. Code, § 56321, subd. (e).)

A school district must provide parents with prior written notice when it proposes or refuses to initiate or change the identification, evaluation, or educational placement of a child or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503; Ed. Code, § 56500.4.)

When a student is referred for assessment, the school district must provide the student's parent with a written proposed assessment plan within 15 days of the referral, with limited exceptions not applicable in this case.  (Ed. Code, § 56321, subd. (a).)  The parent shall have at least 15 days from the receipt of the proposed assessment plan to arrive at a decision, and the assessment may begin immediately upon receipt of the parent's consent.  (Ed. Code, § 56321, subd. (c)(4).)

The school district has 60 days from the date it receives the parent's written consent for assessment, excluding vacation and days when school is not in session in excess of five schooldays, to complete the assessments and develop an IEP, unless the parent agrees in writing to an extension.  (20 U.S.C. § 1414(a)(1)(C); Ed. Code, §§ 56043, subds. (c) & (f), 56302.1, subd. (a), 56381, subd. (a).)

Each public agency must ensure that assessments and other evaluation materials used to assess a child are, among other things, administered by trained and knowledgeable personnel and administered in accordance with any instructions provided by the producer of such assessments.  (20 U.S.C. § 1414(b) & (c); 34 C.F.R. § 300.304; Ed. Code, §§ 56320, 56322, 56381, subd. (e).)  The personnel who assess the student shall prepare a written report.  (Ed. Code, § 56327.)

The assessment must be conducted in a way that:

- uses a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent;
- does not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability; and
- uses technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(20 U.S.C. § 1414(b)(2)(A)-(C); 34 C.F.R. §300.304(b); see Ed. Code, § 56320.)

The assessments used must be:

- selected and administered so as not to be discriminatory on a racial, cultural, or sex basis;
- provided in a language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally;
- used for purposes for which the assessments are valid and reliable;
- administered by trained and knowledgeable personnel; and
- administered in accordance with any instructions provided by the producer of such assessments.

15

(Ed. Code, §§ 56320, subds. (a) & (b), 56381, subd. (e); see 20 U.S.C. § 1414(b) & (c); 34 C.F.R. § 300.304(c).)

The determination of what tests are required is made based on information known at the time.  (See *Vasheresse v. Laguna Salada Union School Dist*. (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157-1158 [assessment adequate despite not including speech/language testing where the concern prompting the assessment was reading skills deficit].)  No single measure, such as a single intelligence quotient, shall be used to determine eligibility or services.  (Ed. Code, § 56320, subds. (c) & (e).)  Assessors must be knowledgeable about the student's suspected disability and must pay attention to student's unique educational needs such as the need for specialized services, materials, and equipment.  (Ed. Code, § 56320, subd. (g).)

A procedural violation results in a denial of a FAPE only if the violation:

- impeded the child's right to a FAPE;
- significantly impeded the parent's opportunity to participate in the decisionmaking process; or
- caused a deprivation of educational benefits.

(20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2); Ed. Code, § 56505, subd. (f)(2) and (j); *W.G., et al. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target Range*); see *N.B. v. Hellgate Elementary School Dist., ex rel. Board of Directors, Missoula County, Mont*. (9th Cir. 2008) 541 F.3d 1202, 1208, quoting *Amanda J. ex rel. Annette J. v. Clark County School Dist*. (9th Cir. 2001) 267 F.3d 877, 892.)

## STUDENT'S EDUCATIONAL AND DEVELOPMENTAL HISTORY

Student has a lengthy history of disagreement with Upland regarding Student's educational needs.  However, the last time Student attended an Upland school was during kindergarten in the 2004-2005 school year.  For first through sixth grades, Student attended a traditional, independently operated, parochial school called Our Lady of the Assumption School.  For the 2010-2011 and 2011-2012 school years, seventh and eighth grades, Student was enrolled at California Virtual Academy, an online charter school.  After dissatisfaction with the charter school, Mother created a homeschool program for Student.  On October 6, 2011, Mother registered what she named Resurrection Academy as a private religious school through the California Department of Education online Private School Affidavit Form process.  Mother renewed the registrations annually from the 2011-2012 through 2018-2019 school years.

During the time frame relevant to this consolidated case, Mother never disclosed to Upland that Student was a homeschool student.  Mother always told Upland Student attended a private school, and referred to Student as attending Resurrection Academy. Student received services at Lindamood-Bell Learning Center in Rancho Cucamonga for some periods of time at Mother's expense, and immediately before the disputed October 31, 2016 IEP, Student received services at Lindamood-Bell at Upland's expense under a prior settlement agreement.  Upland staff were never aware Resurrection Academy was not an independently operated parochial school, like Our Lady of the Assumption.  Upland staff never knew Mother was the director, principal, and custodian of records for the private school Student attended.

Student's developmental history was marked by difficulty feeding in the first two years, low muscle tone called hypotonia, and gross motor delays.  During an assessment by San Bernardino County when she was almost five years old, she had a

17

full scale intelligence quotient of 66 and adaptive behavioral skills composite score of 64, both significantly below average.  She was identified as having intellectual disability.  In an assessment by the Inland Regional Center when she was six years old, Student had a full scale IQ of 67, and an adaptive behavioral skills composite score of 63, both significantly below average, again in the intellectually disabled range.  Upland conducted a psychoeducational assessment when Student was seven years old, and her full scale IQ was 63.  Upland conducted another assessment when Student was almost nine years old, and her Language score was 71, and her scores in Attention/Executive Function, Sensorimotor Functions, Visuospatial Processing, and Memory and Learning were all in the 50s and 60s, described as "significantly below average."  Claremont Unified School District conducted a psychoeducational assessment of Student in 2008 when she was 11 years old.  Similar to all prior testing, her full scale IQ was 64, and her adaptive behavior skills composite score was 68, significantly below average.

Student had a triennial reassessment in 2011.  At that time, Student was eligible for special education and related services under the category of intellectual disability, with a secondary eligibility of speech or language impairment.

## 2014 UPLAND TRIENNIAL EVALUATION

Upland conducted a triennial evaluation beginning in February 2014, when Student was 16 years and 11 months old.  The Revised Psychoeducational Assessment Report bore a grid on the front page with some information that was not consistent with other information on the grid, in the report, or documented during later IEP team meetings, and appeared to reflect the revision process the report had undergone between the time the triennial assessment began or some version of a report was first created, and later revisions.  For example, when Upland administered academic achievement testing in April 2014, Student's standard scores were calculated based on

18

her age of 17 years and one month, and Upland's estimation that, by her age and the year she should have started school, she was in grade 11.8. However, the report grid stated Student was in 10th grade. The Revised Psychoeducational Assessment Report was dated on the first page September 30, 2014, but was signed by school psychologist Ron Davis on January 29, 2015, and there was evidence some earlier version of the report existed, possibly in June 2014.

## MOTHER'S INTERFERENCE WITH THE 2014 TRIENNIAL EVALUATION

Davis reported that during testing, Student demonstrated an adequate attention span and concentration on assessment tasks, and worked well within time constraints on each task. Davis noted the results of the testing and evaluation procedures appeared valid for the purpose of determining if Student continued to qualify for special education and related services and the appropriate placement to meet her educational needs in the least restrictive environment. However, Davis remarked the test results were not properly standardized because Mother was in the testing room during evaluation and the tests were normed without a parent in the room.

Beyond any uncertain effect of Mother's presence in the testing room based on standardization norms, Mother's presence during testing directly and adversely affected the Woodcock-Johnson Tests of Achievement, Third Edition. Credentialed special education teacher Adam Stites administered that instrument on April 28, 2014. The areas the Woodcock-Johnson Tests of Achievement assessed included reading, mathematics, written language, and academic knowledge. Stites could not administer the Letter-Word Identification subtest because Mother stopped the testing before that subtest was administered. Therefore, there were no scores for that subtest. The absence of that subtest also meant there were no broad scores for the areas of Reading, Academic Skills, or Total Achievement, which all depended on and included the

Letter-Word Identification subtest Mother prevented Upland from administering.  For all the areas of achievement that could be reported, Student's scores were reported as in the "significantly below average range" and below the first percentile.

At hearing, Upland school psychologist Christy Bock testified regarding the 2014 psychoeducational assessment report and the consequences of Mother preventing Stites from administering the Letter-Word Identification subtest.  Letter-Word Identification is involved in reading, which was a known area of need for Student. Mother stopping the testing prevented Upland from assessing Student in a known area of need.  After Bock, Mother was the next witness.  Student's attorney called Mother's attention to the part of the 2014 triennial psychoeducational assessment report that said Mother was present in the room during the academic achievement testing and interfered.  Student's attorney asked Mother to explain what happened.  Mother's response was evasive and not about the special education teacher and the Letter-Word Identification subtest documented in the report.  Mother attempted to shift blame for her conduct to Upland and did not answer the question Student's attorney asked. Mother's response was intended to suggest that her presence and interference in testing was somehow justified and even required.  Rather than explain why she interrupted the testing done by the special education teacher, Mother responded that when the speech-language pathologist was assessing Student, Mother observed the assessor using the wrong pictures for the questions and she spoke up to tell the assessor there was a problem so the assessor would correct it and Student would not score a zero.  This testimony established Mother had, by her presence in the testing room, twice interfered with Upland's assessment, preventing full administration of not only the academic achievement evaluation, but also disrupting the language development/communication evaluation.

QUESTIONS ABOUT INTELLECTUAL DISABILITY ELIGIBILITY

In 2014, based upon Student's performance on the Weschler Intelligence Scale for Children, Fourth Edition, Student had a full scale IQ of 57, with a 90 percent chance her true IQ was somewhere between 54 and 62, all within the significantly below average range, below the first percentile.  Overall her cognitive ability was commensurate with her previous assessment results.

However, in determining Student's category of eligibility for special education and related services, school psychologist Davis stated in the psychoeducational assessment report that it was unclear whether or not Student continued to meet special education eligibility criteria as a student with intellectual disability.  Davis stated there were inconsistencies in her cognitive and academic scores.  He concluded her disability was not the result of environmental disadvantage, economic disadvantage, cultural differences, motor disability, visual impairment, or hearing impairment.  However, Davis stated intellectual disability, limited school experience, and poor school attendance could not be ruled out as possible contributing factors.  Davis' caveats meant, in other words, the clandestine homeschool program Mother provided Student for the three years before the triennial assessment might have been a cause of Student's poor scores on standardized testing.  In the 2014 triennial psychoeducational assessment report, Davis recommended a comprehensive re-assessment of Student's overall cognitive and academic functioning as well as other areas of suspected disability.

The 2014 triennial psychoeducational assessment report noted there was no doubt Student's significant deficits in her receptive and expressive language as well as difficulty with specific areas of language continued to qualify her for special education and related services in the category of speech or language impairment.

## HEALTH ASSESSMENT

The 2014 triennial reassessment included a health assessment by a school nurse. Some information in the Health Update report was obtained in March 2014, and other health and medical information from Mother dribbled in over the next year.  The school nurse, who was a registered nurse, reported the information in a final document reflecting it had been revised March 16, 2015.  Mother did not make Student available for any hearing or vision screenings, and all information to prepare the report was through health assessments/reports of other medical providers "provided by mother of student and a completed parent questionnaire."

## 2014 INDEPENDENT EDUCATIONAL EVALUATION

Mother disagreed with Upland's 2014 psychoeducational assessment and requested an independent educational evaluation by clinical neuropsychologist Nancy Ellen Markel, Ph.D.  Upland funded the independent evaluation and Dr. Markel evaluated Student on October 6 and 7, 2014.  Dr. Markel's Neuropsychological Evaluation Report included some information Dr. Markel reported she received from Mother on January 15, 2015.

Dr. Markel defined the purpose of her evaluation as "to have an understanding of [Student's] neurocognitive status."  Dr. Markel related several events evidencing Student's low level of functioning despite being 17 years old and having "attended Resurrection Academy where she receive[d] 1:1 individualized instruction" since she was 14 years old.  Dr. Markel asked Student her date of birth and Student responded, "I don't know."  Student could only state how old she was.  The next day, Dr. Markel gave Student a form to complete as part of the Behavior Assessment Scales for Children, Second Edition, Self-Report.  Where the form called for "birth date," Student wrote 1997.

22

Dr. Markel reported, "The examiner had to explain [to Student] she had put the year of her birth and it became clear that she did not understand what 'Birth Date' meant." When completing the forms, Student announced she was done after completing only page 1, and had to be instructed to go on to pages 2, 3, and 4.  Student was not able to read and understand the instructions for the behavior assessment rating scale and Dr. Markel had to explain them to her.

Dr. Markel's summary of standardized instruments she administered reported Student's full scale IQ score on the Wechsler Adult Intelligence Scale, Third Edition, was 66, at "an extremely low level (1st Percentile)."  Her General Ability Index, an optional composite summary score that was less sensitive to the influence of working memory and processing speed, was 68, in the second percentile.  Due to Student's known language and motor problems, Dr. Markel also administered the Comprehensive Test of Nonverbal Intelligence, Second Edition, a non-verbal measure of intelligence that has no speeded tests and very little motor requirements.  Student's Full Scale Composite was 71, in the third percentile.  Despite these low overall scores, Student had scores in some areas that were in the average or low average ranges, among other areas that were in the severely impaired range.

In terms of academic functioning, Dr. Markel reported Student's relative strength was in decoding, with scores in Word Reading and Pseudoword Reading of 84 and 89 respectively, described as at the below average level.  Despite Student's relative strength in pronouncing aloud words displayed on a page or screen, her comprehension was severely impaired.  Student's scores in reading comprehension were in the first and second percentiles, and below the first percentile, on three different standardized tests to assess reading comprehension.  In written expression, Student performed at a very

low level with her strength in Spelling at a score of 72, in the third percentile, and her Sentence Composition score at 59, at the 0.3 percentile.

Student also showed a relative mathematical strength in Math Fluency-Addition, in which she scored 81, in the 10th percentile.  In contrast, in both Math Fluency-Subtraction and Multiplication, she scored 66, in the first percentile.  Her Math Problem Solving score of 61 was in the 0.5 percentile, and her Numerical Operations score of 62 was in the first percentile.

Many tests of Student's executive functioning were notable for poor performance on the basic, fundamental skills measured.  Her executive functioning on these tasks fell at the same low level as the fundamental skills or sometimes a bit higher.

Dr. Markel did not include any conclusions or diagnoses in her report.  She only opined Student required "intensive educational and language therapy."  She stated it was essential that Student have a transition plan with "an emphasis on functional goals that will help determine if [Student] will be able to be independent as a young adult or will require structured assistance. . . . [S]he will need to be monitored to determine her ability to use good judgment and to recognize how to function safely in the community. Whether [Student] will be able to be competitively employable or will required [sic] supportive employment is yet to be determined."  Dr. Markel's summary and recommendations indicated she did not believe Student was cognitively capable of pursuing a regular high school diploma, college, and an independent career, but instead required a functional curriculum to assure her safety in the community.  Dr. Markel doubted Student's ability to be employed outside of a supervised, supported position designed to enable a disabled person to work.

CONTINUATION TRIENNIAL IEP TEAM MEETINGS AND ADDITIONAL ASSESSMENT PLAN PROVIDED TO MOTHER

Based on its 2014 triennial assessment, Upland identified attention as an area that warranted additional assessment to give insight whether attention issues adversely impacted Student's processing speed. Upland recommended administration of the Test of Variables of Attention and gave Mother an assessment plan in March 2015 for further testing in the areas of attention and social-emotional functioning. Upland gave Mother a second copy of the assessment plan in April 2015.

The IEP team met to review Dr. Markel's independent neuropsychological evaluation on July 13 and 27, 2015. The July 2015 IEP team meetings were a continuation of a triennial IEP team meeting in early April 2015. Dr. Markel could not attend the July 13, 2015 IEP team meeting, which was convened at very short notice due to Mother's scheduling difficulties. Therefore, Upland school psychologist Bock presented the first 13 pages of the results of the independent evaluation for the IEP team's review and consideration. There was not enough time to review the whole report. Bock noted areas of similarity and difference between the results of the independent evaluation and Upland's triennial assessment. One significant difference was in the area of math problem solving, on which Student scored 61 on the instrument Dr. Markel used and 36 on the instrument Upland used.

At the July 13, 2015 IEP team meeting, Bock stated Dr. Markel's evaluation did not provide the IEP team additional insight into Student's attention. Upland therefore continued to recommend administration of the Test of Variables of Attention. Mother verbally consented for Upland to administer the Test of Variables of Attention, and Upland stated it would provide Mother a written assessment plan to obtain her written consent.

25

At a further continuation of the triennial IEP team meeting on July 27, 2015, Dr. Markel attended and reviewed, from the beginning, her entire report. Dr. Markel agreed some variability in Student's test scores could not be explained aside from the nature of the tests or Student's "attentional capacity." Upland then gave Mother a revised written assessment plan to obtain her consent to administer the Test of Variables of Attention. Despite Mother's prior verbal consent, Mother never signed written consent to Upland administering the Test of Variables of Attention.

Mother later complained to the California Department of Education that Upland had not timely held an IEP team meeting to review results of the Test of Variables of Attention, which it had never administered due to lack of written parental consent. Mother asserted it was unnecessary to sign the assessment plan because she had verbally consented to the assessment during an IEP team meeting. The California Department of Education concluded, and informed Mother, Upland was in compliance because "the student's parent never provided the requisite written consent to assess."

## MOTHER'S DISAGREEMENT WITH INTELLECTUAL DISABILITY ELIGIBILITY

A preponderance of the evidence established that in 2015, Mother objected to Student's eligibility category continuing to be intellectual disability. Mother rejected the conclusion that Student's low IQ coupled with low adaptive functioning skills meant she met the criteria for being intellectually disabled. Upland's 2014 triennial reassessment report fueled Mother's denial by questioning Student's continuing eligibility under the category of intellectual disability and pointing to the possibility of a specific learning

disability due to inconsistency in Student's broad range of cognitive and academic scores.  Significantly, Davis recommended Upland conduct a comprehensive reassessment of Student's overall cognitive and academic functioning to determine whether intellectual disability, limited school experience, or poor school attendance contributed to the variable scores obtained.

As low as Student's cognitive ability scores were, her academic achievement scores were, in some areas, so much lower as to appear to possibly be a significant discrepancy between ability and achievement, one definition of the eligibility category of specific learning disability.  This unusual result was caused by Upland calculating results on the Woodcock-Johnson Tests of Achievement in the available areas of academic achievement based on the estimate, related to Student's age of just over 17 years when Upland administered the Tests of Achievement, that Student was in grade 11.8.  The ability to characterize Student's disability as relating to a substantial gap between ability and achievement seemed to serve Mother's desire to not describe Student as having intellectual disability.  But curiously, Mother also resisted accepting Student's extremely low academic achievement standard scores by claiming they were erroneously low because they were calculated by comparing her against neurotypical students in the 11th grade.  In July 2015, Mother asserted that at the time of testing late in the 2013-2014 school year, Student was only in 8th grade.  Mother believed if Student's performance had been compared to other 8th graders, her standard scores would have been higher.  Mother's argument undermined her own preference for Student's eligibility category to be something other than intellectual disability, because an increase in Student's standard scores in academic achievement due to reducing the level of the peer group against which her performance was compared would have closed the gap between ability and achievement and removed the specific learning disability eligibility category from consideration.  This episode was another example of

27

Mother's unreasonable conduct.  In response to Mother's concerns, Upland agreed to report Student's academic achievement scores based on an age equivalency and grade level equivalency for reported areas.  For example, in the area of the area of applied problems, specifically with money calculations as identified by her performance on questions specific to money, Student had a grade equivalency of 1.2.

In the face of Mother's rejection of the eligibility category of intellectual disability and Upland's questioning of it, the IEP team agreed to change Student's primary eligibility category to specific learning disability, and her secondary eligibility category remained speech or language impairment.  The designation was changed before the July 13, 2015 IEP team meeting and reflected on the cover page of the IEP of that date. But full explanation of the manner in which Student's supposed visual and auditory processing deficits adversely impacted the speed with which she processed information did not get documented on the cover page of Student's IEP until July 27, 2015.  The July 27, 2015 IEP noted Student's weaknesses in memory made her recall and retrieval slow, her cognitive abilities in conceptualization and expression were areas of weakness that adversely impacted her ability to comprehend, generalize, and express herself, and she had mild to moderate receptive language deficits and moderate to severe expressive language deficits.

Based on Upland's calculation that Student would have been in the 10th grade during the 2013-2014 school year, when it had begun Student's 2014 triennial reassessment, Upland documented on the July 13, 2015 IEP that Student was in 12th grade for the 2015-2016 school year.  However, at the July 27, 2015 IEP team meeting, Mother stated Student was in 10th grade for the 2015-2016 school year.  Not having any other information on the topic from Student's private school, Upland took Mother's word for it and changed the July 27, 2015 IEP document to indicate Student

28

was in 10th grade.  The July 27, 2015 IEP also identified Student's last triennial evaluation date as June 30, 2014, and stated Student was due for her next triennial evaluation by June 30, 2017.

## SEPTEMBER 30 AND OCTOBER 19, 2016 ASSESSMENT PLAN

On September 30, 2016, Upland sent Mother an Assessment Plan for Student's triennial evaluation.  Upland proposed:

- to have a special education teacher assess Student's academic achievement, measuring her reading, spelling, arithmetic, oral and written language skills, and/or general knowledge;
- to have a school nurse gather health information and testing to determine how Student's health affected school performance;
- to have a school psychologist assess Student's intellectual development, by measuring how well Student thought, remembered, and solved problems;
- to have a speech-language pathologist assess Student's language/speech communication development, measuring Student's ability to understand and use language to speak clearly and appropriately;
- to have an occupational therapist and a school psychologist assess Student's motor development, measuring how well Student coordinated body movements in small and large muscle activities, and possibly also measuring perceptual skills;
- to have a school psychologist assess Student's social/emotional functioning, indicating how Student felt about herself, got along with others, took care of personal needs at home, school, and in the community;
- to have a school psychologist assess Student's adaptive/behavior functioning, also indicating how Student took care of personal needs at home, school, and in the community; and

29

- to have a special education teacher assess Student's needs in the area of post-secondary transition, related to training, education, employment, and where appropriate, independent living skills.

The assessment plan informed Mother that the tests and procedures conducted for the assessments could include but were not limited to classroom observations, rating scales, interviews, record review, one-on-one testing, or some other types or combination of tests.  The assessment plan informed Mother she would be invited to an IEP team meeting to discuss the results of the assessments, and in fact included invitations to an IEP team meeting to be held on either October 21 or 31, 2016, whichever Mother would confirm.  Along with the September 30, 2016 assessment plan and IEP team meeting invitations for October 21 and 31, 2016, Upland sent Mother a form to sign to authorize the release of information between Upland and Student's private school.  Mother did not respond or return the assessment plan and release.

Upland followed up with Mother by email on the morning of October 19, 2016, regarding the assessment plan, IEP team meeting invitations, and release of information form.  Upland included a Prior Written Notice form regarding the proposal to initiate the evaluation of Student, which explained that Upland would conduct the triennial evaluation by reviewing records, administering standardized testing, conducting interviews, and through observations.  Upland explained additional data was needed to determine whether Student continued to meet eligibility criteria and continued to need special education and related services, her present levels of performance, and whether any modifications to special education and related services were needed to enable Student to meet the annual goals in her IEP and to participate, as appropriate, in the general curriculum.  Upland stated a records review alone could