not provide information about her current functioning.  Upland included another triennial assessment plan, identical to the one sent to Mother on September 30, 2016, but dated October 19, 2016.

On the afternoon of October 20, 2016, Mother wrote to Upland that she disagreed with Upland's assessments and requested independent evaluations for the Test of Variables of Attention by Dr. Timothy Gunn, an assistive technology evaluation by Cynthia Cottier, and a central auditory processing assessment.

On October 27, 2016, Upland sent Mother a written response to her request for independent evaluations.  Upland explained it was denying Mother's request for independent evaluations at public expense because Upland was not obligated to fund independent evaluations unless and until a parent disagreed with an assessment the school district had done.  Mother had not signed the triennial assessment plan and Upland had not performed any assessments.  Upland had not assessed Student with the Test of Variables of Attention because Mother had not signed consent to the March 2015, April 2015, or July 27, 2015 assessment plans that would have authorized Upland to administer that instrument.  There was no evidence Upland had assessed Student's central auditory processing or purported need for assistive technology as part of the 2014 triennial reassessment, or that Parent requested Upland to assess Student in these areas in 2014.  Therefore, Student had no right to independent evaluations at public expense until Upland had the opportunity to assess Student in these areas Mother requested.

Upland's October 27, 2016 correspondence to Mother included another copy of the September 30, 2016 triennial assessment plan.  In response to Mother's request for assessments for central auditory processing disorder and assistive technology needs, Upland also sent Mother a separate assessment plan dated October 27, 2016, for

31

"CAPD and AT assessment," offering to have an audiologist assess Student for central auditory processing disorder, and to have a speech-language pathologist assess Student's need for assistive technology.  Upland requested Mother sign the two assessment plans, and also sign the release of information authorization form to allow exchange information with the private school Student attended.

Upland convened an annual IEP team meeting for Student on October 31, 2016.  Mother had not consented to the September 30 and October 19, 2016 triennial reassessment plan, the supplemental October 27, 2016 assessment plan, or the release and exchange of information between Upland and the private school Student attended.  Mother continued to conceal the fact that Resurrection Academy was a homeschool operated by Mother and that she was the director, principal, and custodian of records who could provide all information and records Upland sought.

During the IEP team meeting, Upland attempted to obtain Mother's written consent to the triennial reassessment and additional assessments Mother requested.  Upland gave Mother a fourth copy of the assessment plan for the triennial reassessment due by June 30, 2017, a second copy of the supplemental assessment plan for the central auditory processing disorder and assistive technology assessments Mother requested, and a third copy of the release of information form for Mother to consent to Upland communicating with the private school.  Mother did not consent to any of these.

32

During the following months, Mother and Upland had many more communications in which Upland unsuccessfully attempted to obtain Mother's consent to the triennial reassessment proposed in the September 30 and October 19, 2016 assessment plan. In the remainder of the 2016-2017 school year, Mother never inquired, as stated in Student's Issue 1, "why Upland wanted to do additional assessments" after the 2014 triennial reassessment.

The reasons for Upland proposing a triennial evaluation were quite obvious. Most importantly, Upland was required to comprehensively reassess Student by June 30, 2017, for a statutorily mandated triennial evaluation. Upland prudently began pursuing consent for that mandatory reassessment in fall 2016. Mother had previously been difficult to work with to obtain consent, and Upland needed information to determine Student's continuing eligibility for special education and related services by June 30, 2017. Student's characterization of the last triennial as having been completed in 2015 does not change the prior history in which Student had triennial evaluations in 2011 and 2014.

Additionally, the results of the last triennial evaluation were debated and, in part because Mother interfered with the administration of some instruments, did not provide a complete picture of Student's abilities and deficits when they were administered. Even at the time Upland conducted the 2014 psychoeducational assessment, it recommended a comprehensive reevaluation. Upland attempted to acquire additional information in areas of suspected disability such as attention and social-emotional functioning as it related to attention, but Mother did not provide written consent to further assessment.

And finally, in fall 2016, Upland required information regarding Student's present levels of performance to develop an appropriate offer of goals, placement, and related services for Student. Student was 19 years old and had not attended an Upland school

since kindergarten.  Upland did not have the daily opportunity to observe Student to document her performance and track her progress.  Upland required current information to fulfill its obligation to offer Student a FAPE for the 2016-2017 school year.

All the uncertainty and confusion Mother alleged in Student's multiple complaints and feigned at hearing were not credible.  The evidence established that rather than being confused as to the reasons why Upland wanted to the assessments, Mother simply did not want Upland to assess Student.  The evidence established Mother's claimed confusion was merely an after-the-fact attempt justify her prior refusal to consent to the assessments sought by Upland.  At hearing, Mother claimed her background gave her a strong distrust of government, including the school district.  However, she concocted implausible fears about the health assessment by a school nurse devolving into a strip search, or a pelvic exam by a doctor who specialized in obstetrics and gynecology.  Whether her testimony on this point was honest or only invented to rationalize her supposed uncertainty about the need for a triennial evaluation and her failure to consent, Mother's conduct was unreasonable.

Student attempted to characterize the 2014 triennial evaluation, which Upland began in February 2014, as not being complete until August 2015 and alleged the triennial assessment Upland proposed on September 30, 2016, "would have been a second triennial assessment, as one had already been conducted."  The extensive and explicit history made clear Student's self-serving miscalculation of the 2014 triennial evaluation, and the several appropriate reasons Upland sought to timely reassess Student before June 30, 2017.  The evidence established that Mother did not lack adequate information about in what areas of suspected disability Upland proposed to

assess Student and why Upland sought to conduct those assessments.  Rather, she only lacked a willingness to allow Upland to conduct a comprehensive triennial evaluation.

The information Upland provided on the September 30 and October 19, 2016 assessment plans itself was sufficient to inform Mother of the areas of suspected disability Upland intended to assess, the methods it would use to assess Student, and the category of personnel who would assess each area.  Upland also provided Mother a prior written notice explaining that Upland would conduct the triennial evaluation by reviewing records, administering standardized testing, conducting interviews, and through observations.  Upland explained additional data was needed to determine whether Student continued to meet eligibility criteria and continued to need special education and related services, her present levels of performance, and whether Student needed any modifications to special education and related services to meet the annual goals in her IEP and to participate, as appropriate, in the general curriculum.  Mother had received the 2014 triennial psychoeducational assessment report, which immediately recommended a comprehensive reevaluation because the results were not clear.  Mother was familiar with testing procedures and types.  Student had been repeatedly assessed by Upland, and others, in 2001, 2003, 2004, 2005, 2008, 2011, and 2014.  Also, Student's older sibling had undergone repeated psychoeducational evaluations as part of determining eligibility for special education and related services and developing appropriate programs for that sibling.  Mother was very familiar with the process.  Therefore, Mother was adequately informed, and Student did not establish Mother required any additional information to decide whether or not to sign the triennial reassessment plan.

Upland did not fail to provide Mother any information regarding assessments to which she was entitled.  And information Mother wanted but either did not request or

obtain did not significantly impede Parent's opportunity to participate in the educational decisionmaking process.  Mother had sufficient information to consent to the triennial reassessment Upland proposed to conduct pursuant to the September 30 and October 19, 2016 assessment plan.

Student did not meet her burden of proof with respect to Issue 1.

## ISSUE 2:  PRIOR WRITTEN NOTICE IN RESPONSE TO PARENT'S OCTOBER 19, 2016 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS

Student contends Upland failed to provide Mother prior written notice and Mother had no information as to the basis of Upland's denial of Mother's October 19, 2016 request for independent educational evaluations in the areas of the Test of Variables of Attention by Dr. Gunn, assistive technology by Cottier, and central auditory processing disorder.

Upland contends Student's Issue 2 is barred by the applicable statute of limitations, and further, on October 27, 2016, Upland provided legally sufficient prior written notice of its decision to deny Mother's request for independent educational evaluations.

As discussed above, Student failed to timely state her claim in Issue 2.  This claim was not stated in the Prior 2018 Case, refiled as Student's Second Case.  The claim was first stated in the second amended complaint in Student's First Case, filed on May 4, 2020.  Even if the claim relates back to the original filing date of Student's First Case, August 13, 2019, Student's claim is untimely.

The documentary evidence established Mother emailed a request for independent evaluations to Upland on the afternoon of October 20, 2016.  On October 27, 2016, Upland replied to Mother's email requesting independent evaluations. Upland's letter expressly stated it was provided under title 34 Code of Federal Regulations part 300.503 as a notice of Upland's "proposed and/or refused actions . . . as it relates to" Mother's request for independent educational evaluations.

Any challenge to the adequacy of Upland's response, denying Mother's request, was required to be filed within two years of Upland's response, October 27, 2018. Student failed to timely file a claim regarding the sufficiency of Upland's response to Mother's October 20, 2016 request for independent educational evaluations.  Therefore, as stated above, Issue 2 is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3:  OCTOBER 31, 2016 IEP

Student contends the October 31, 2016 IEP did not offer her a FAPE for a variety of specific reasons, stated and addressed below.  Upland contends the October 31, 2016 IEP was reasonably calculated to confer educational benefit based on the information available to Upland at the time of the IEP team meeting.

In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the results of the most recent evaluations of the child, and the academic, developmental, and functional needs of the child.  (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324(a).)

## THE OCTOBER 31, 2016 IEP

### PRESENT LEVELS OF PERFORMANCE

At the IEP team meeting on October 31, 2016, Upland attempted to obtain from Mother information about Student's present levels of performance because Mother had not consented to Upland learning that information through a triennial reassessment or directly from Resurrection Academy.  The most recent information Upland had after the 2014 triennial evaluation was based on Mother's reports from August 12, 2015.

In October 2016, Mother reported Student received instruction at Lindamood-Bell and some speech therapy.  The IEP team reviewed existing data and considered additional information Mother provided, and documented what little information it had available.

In the area of communication development, Upland reviewed information from 2014 assessments by both Upland and independent evaluator Abby Rozenberg. Student's oral-peripheral structures were within functional limits, and fluency, voice, articulation, and phonology were normal.  However, Student had lower than average receptive and expressive language abilities, as well as pragmatic language difficulties.  In the past, Upland had recommended Student receive services in both pull-out and push-in models to best benefit her language development in the least restrictive environment.  In October 2016, Mother only reported that with speech therapy and Lindamood-Bell services, Student had "made great progress."  Mother did not provide details of Student's present levels of performance in her previously known areas of need in pragmatics, inferences, oral expression, non-literal language, listening comprehension, and idiomatic language.

In gross and fine motor development, Upland reviewed information from 2014 assessments reflecting below average fine manual control and motor coordination except for upper limb coordination.  Student held a writing tool in a lateral tripod grasp, and although she had some difficulties with letter size and spacing between words when writing a sentence, her handwriting overall was legible and her scissors skills were good.  She had some sensory processing difficulties, specifically low registration.  She exhibited functional mobility skills for accessing the high school environment.  In October 2016, Mother, through her advocate, reported Student "made progress" in these areas by participating in martial arts, vision therapy, and reflex integration therapy.  Mother did not provide details of Student's present levels of performance in her previously known area of need in sensory processing.

In social-emotional and behavioral functioning, Upland reviewed information from 2014 assessments reflecting Student's self-report that she felt she often did not get things correct.  Dr. Markel had noted Student's perseverance with tasks.  In August 2015, Mother reported Student had anxiety when presented with new tasks or new people, transitions, and being in large groups with which she was not familiar.  Mother reported Student followed directions, was compliant, hard-working, well-behaved at home and at school, and said teachers reported Student had a cooperative spirit.  In October 2016, Mother reported Student's anxiety level had decreased.  Student was more social at school and home.  Student also was more independent, in that Mother could drop her off at Lindamood-Bell for her session and pick her up when she was finished.

In the area of adaptive and daily living skills, Upland reviewed information from August 2015 reflecting Mother reported Student was independent in taking care of her personal needs.  In October 2016, Mother reported Student improved her independence by feeding the pets and being able to stay home alone.

In the area of health, Upland reviewed information from the 2014 triennial evaluation, and Mother provided a review and update of Student's health history. Mother reported Student was managing her health concerns well.  Due to a diagnosis of mild scoliosis in 2014, Student continued to follow up with physical therapy every two to three months, did exercises at home, and did not require a back brace.  Mother reported after an evaluation by optometrist Dr. Douglas Stephey in April 2015, Student received reflex integration therapy from him.  While Student had a hearing screening by her primary care provider in 2015 and was within normal limits, on October 20, 2016, Mother had requested an independent evaluation by an audiologist for auditory processing disorder.  The health information Mother provided did not suggest Student had school-based medical needs and Mother did not request Upland provide services to address any educational impact of Student's health or medical conditions.

In the area of academic and functional skills, in mathematics, Upland learned in April 2014 Student's scores on the Woodcock Johnson Tests of Achievement reflected she performed at the 3.5 grade level on Math Calculations, adding and subtracting single- and multiple-digit numbers independently.  On August 12, 2015, Mother reported Student completed one-digit-by-three-digits and two-digits-by-two-digits multiplication math problems independently with 90 percent accuracy, and took what appeared to Mother to be an appropriate amount of time to complete these tasks.  In October 2016, Mother reported Student was working on the Cloud Nine mathematics program at Lindamood-Bell, and working on two-digits-by-three-digits multiplication,

long division, and word problems.  Mother did not provide details of Student's present levels of performance in her previously known areas of need in math reasoning and math calculation.

In English language arts, Upland learned in April 2014 Student's scores on the Woodcock Johnson Tests of Achievement reflected she performed at the 3.4 grade level on Passage Comprehension, able to comprehend and fill in the blank to a question after reading one to two sentences.  On the Writing Samples subtest, Student was able to produce written work in the form of a sentence with a noun and verb with appropriate simple grammar and syntax.  In July 2015, Mother reported that Lindamood-Bell thought Student was not yet at the point to participate in writing instruction and therefore no writing samples were available.  In October 2016, Mother claimed Student's comprehension was at 10th grade level by a Lindamood-Bell progress report.  Mother did not provide details of Student's present levels of performance in her previously known areas of need in reading decoding, reading comprehension, and written expression.

In vocational skills, the IEP team reviewed that as Mother reported in 2015, her goal was for Student "to be college bound after graduating high school with a diploma." In October 2016, Mother did not provide any additional information.

The IEP team determined for Student to receive educational benefit, she needed goals in the following areas of need: written expression, reading decoding, reading comprehension, math reasoning, math calculation, sensory processing, pragmatics/social communication, inferences, oral expression/narration, non-literal language, listening comprehension, and idiomatic language.

Mother had reported at the July 27, 2015 IEP team meeting that Student had been in ninth grade for the 2014-2015 school year.  Upland accepted Mother's representation and documented Student would be in 10th grade for the 2015-2016 school year.  At the October 31, 2016 IEP team meeting, Mother reported that based on information provided by Lindamood-Bell, Student was in 10th grade.  Upland informed Mother that the school district determined a student's grade level in high school based on the number of credits the student has earned.  Upland suggested an Upland High School counselor meet with Student's current teacher to update Student's transcript.  Mother responded she would provide Upland with the data they required because she did not feel comfortable signing an authorization for release of information.  Mother asked Upland what specific information staff needed, and Upland requested a copy of Student's most updated transcript.  Mother never provided Upland with a copy of Student's transcript.

The problem, and what Mother continued to conceal from Upland, was Student had no transcript because she did not attend an independently operated private school and Mother did not create a transcript until, at the earliest, August 2019 when Mother, as the principal of Resurrection Academy, gave Student a high school diploma.  Quite possibly, the so-called transcript introduced into evidence at hearing was not even created until Upland subpoenaed documents from Parents for the August 2020 due process hearing.  The document Mother produced in response to the subpoena bore no months, years, semesters, trimesters, or other indicia of when Student allegedly completed the listed courses, or when the document itself was created, modified, or finalized.  Not until September 2020 did Mother provide to Upland a copy of the transcript Upland requested in October 2016 to enable it to determine Student's progress toward completing a regular high school diploma.

GOALS

In the absence of current assessment data and information from Student's private school due to Mother's failure to consent to the triennial reassessment and exchange of information, the IEP team reviewed existing data and listened to input from Mother to estimate baselines in each of Student's goal areas.

In the area of need of written expression in paragraph writing, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 1.6 on the writing sample subtest, and 2.8 in written expression, significantly below average.  Sample work showed she was able to write a sentence with a subject and predicate, in the form of a noun and a verb, with appropriate simple grammar and syntax.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in writing as of October 2016.  Although the last information Upland had suggested Student was functioning in the elementary school range for writing, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to produce written work at a much higher level than her last-documented baseline.  The goal was for Student to be provided with targeted vocabulary familiar to her by vocabulary review and student mastery, and for Student to incorporate the learned vocabulary into a narrative with a minimum of five sentences containing a simple but identifiable beginning, middle, and end with an identifiable subject, basic supportive details, and an end with proper capitalization and punctuation, with 80 percent accuracy and minimal assistance, supported by a graphic organizer.

43

Although reading decoding remained on the list of areas in which Student would have a goal, none was included in the October 31, 2016 IEP.  Dr. Markel's neuropsychological evaluation in October 2014 identified decoding as a relative strength for Student, with standard scores on the Wechsler Individual Achievement Test in Word Reading at 84, Pseudoword Reading at 89, and Basic Reading at 86, far above her Reading Comprehension standard score of 66.  Student was able to read words aloud, but failed to understand their meaning.

In the area of need of reading comprehension, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 3.4 in passage comprehension.  She could fill in the blank for a question after reading one or two sentences.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in reading comprehension as of October 2016.  Mother asserted Lindamood-Bell reported Student's reading comprehension level was at the 10th grade.  Although the last information Upland had suggested Student was functioning in the elementary school range for reading comprehension, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to demonstrate reading comprehension by teaching Student strategies to aid in reading comprehension such as using graphic organizers, the "5W-how model," outlining reading passages, and identifying context clues, and for Student to apply the learned strategies to aid in reading comprehension so she could answer who, what, when, where, why, and how questions about a five-sentence paragraph with 80 percent accuracy, supported by minimal prompting.

In the area of need of math reasoning, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 1.2 on the Applied Problems subtest.  She could call some coins by their names.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in math reasoning as of October 2016.  Although the last information Upland had suggested Student was functioning in the elementary school range for math reasoning, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed an applied problems in math goal for Student to be presented with classroom scenarios of real-life situations where money is used, such as shopping and budgeting, and for Student to use previously modeled strategies like touching money, coin combinations, a number line, and manipulatives, to show combinations of coins up to 99 cents with 80 percent accuracy.

In the area of need of math calculation, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 3.8 in Math Calculations Skills.  She was able to add and subtract single digits, and could add and subtract double digits with minimal success.  She struggled with math calculations when the calculation tasks were mixed on an assignment, such as single-digit addition and subtraction with single-digit multiplication, and double-digit addition and subtraction and double-digit multiplication all on one page of calculation.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in math calculation as of October 2016.  Mother asserted Student was

performing multi-digit multiplication with 90 percent accuracy, and long division and word problems.  Although the last information Upland had suggested Student was functioning in the elementary school range for math calculation, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to perform calculations using multiplication by teaching her the steps in multiple-digit problem solving for addition, subtraction, and multiplication, carrying and borrowing in multiple-digit problems, how to use a multiplication chart, and how to multiply using double digits, then having Student demonstrate the ability to use a multiplication chart as a visual aid when given 15 multiplication problems of single-by-multiple-digit numbers and compute correct answers with 80 percent accuracy.

In the area of need of sensory processing, the last data Upland had was based on the 2014 triennial evaluation.  Student exhibited some sensory processing difficulties, specifically with low registration, which interfered with her ability to complete classroom work and activities.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in sensory processing as of October 2016.  Mother asserted participation in martial arts and integrated reflex therapy prescribed by an optometrist helped Student improve.

Upland proposed a goal for Student's sensory motor processing to train Student in sensory processing strategies designed to assist low registration such as enhancing task and context features, brighter contrast in materials, increased tactile stimulation, movement exercises, strong flavor oral motor experience, and alternating passive and active learning.  Then, when Student demonstrated symptoms of low registration such as missing directions, being slow to respond, or having difficulty organizing work and/or

supplies, for staff to cue Student with visual prompting to a list of strategies and for Student to use sensory processing strategies designed to assist low registration to actively participate in class activities such as written work.

In the area of need of pragmatics/social communication, the last data Upland had was based on the 2014 triennial assessment and independent speech and language evaluation by Rozenberg.  Student demonstrated decreased turn-taking during informal conversation.  She was cooperative and provided answers when asked, but rarely initiated a topic of conversation or provided additional information to an existing topic to continue a conversation.  During informal observation by Upland, Student only participated in one-turn communication, meaning one comment by the speaker followed by one comment by the listener.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in pragmatic/social communication as of October 2016.  Mother asserted Student received speech therapy one hour per week.

Upland proposed a goal to teach Student social rules of group conversation, and for Student to demonstrate the ability to orally express herself by commenting or asking questions during a structured three-turn conversation, with one to two minimal indirect or direct verbal prompts, in eight out of ten opportunities.

In the area of need of inferences, the last data Upland had was based on the 2014 triennial evaluation administration of the Comprehensive Assessment of Spoken Language by Upland's speech-language pathologist.  Student had a standard score of 62 on the Inferences subtest, significantly below average.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in inferences as of October 2016.  Mother asserted Student received speech therapy one hour per week.

47

Upland proposed a goal to present Student with hypothetical situations in either written or verbal form, and for Student to demonstrate the ability to answer inference questions such as the feelings of others, predictions, or cause and effect, with 80 percent accuracy, supported by visual aids and one to two minimal indirect or direct verbal prompts.

In the area of need of oral expression in narration, the last data Upland had was based on the 2014 independent speech and language evaluation by Rozenberg, who administered the Test of Narrative Language.  In oral narration, Student achieved a total raw score of 35, the age equivalent of 6.7 years.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in oral expression in narration as of October 2016.

Upland proposed a goal to provide Student five sequential pictures and for Student to demonstrate the ability to orally present one grammatically and syntactically correct sentence per picture, using associated vocabulary, creating a simple yet cohesive story with one to two minimal indirect or direct verbal prompts.

In the area of need of non-literal language, the last data Upland had was based on the 2014 triennial evaluation and independent speech and language evaluation by Rozenberg, each assessment including the Comprehensive Assessment of Spoken Language.  Student scored 50 and 40, respectively, on the non-literal portion of the test.  Both scores, which addressed Student's ability to answer questions based on non-literal information, were in the severely below average range.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in non-literal language as of October 2016.

Upland proposed a goal to present Student with hypothetical situations in oral or written format that contained non-literal language, such as simile, metaphor, and sarcasm, and for Student to identify the correct message being communicated with 80 percent accuracy with one to two minimal indirect or direct verbal prompts.

In the area of need of listening comprehension, the last data Upland had was based on the 2014 triennial evaluation administration of the Test of Auditory Processing Skills.  Student had a scaled score of 2 in Auditory Comprehension, which was significantly below average.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in listening comprehension as of October 2016.

Upland proposed a goal to teach Student strategies for improved listening comprehension such as listening for a main idea and specific details, summarizing, and recognizing word-order patterns, and for Student to demonstrate appropriate listening skills during classroom discussions by waiting her turn to talk and using sentences that were linked to what was previously stated in the discussion or writing down answers that drew upon information provided in the discussion, supported with minimal verbal prompting, in eight out of ten opportunities.

In the area of need of idiomatic language, the last data Upland had was based on the 2014 triennial evaluation administration of the Comprehensive Assessment of Spoken Language by Upland's speech-language pathologist.  Student had a standard score of 75 on the Idiomatic Language subtest, in the significantly below average range. Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in idiomatic language as of October 2016.  Mother asserted Student received speech therapy one hour per week.

49

Upland proposed a goal to present Student with idiomatic phrases with associated visual aids, and for Student to identify the meaning of 25 therapy-targeted idioms with 80 percent accuracy, with one to two minimal indirect or direct verbal cues.

TRANSITION PLAN

The IEP team also developed an individualized transition plan that included post-secondary goals in training/education, employment, and independent living, specifying activities and community experiences supported by the related service of transition service involving Student's special education case carrier.

OFFER OF SPECIAL EDUCATION AND RELATED SERVICES

Upland was aware of Student's low cognitive and adaptive skills profile, and prior academic testing indicating Student functioned in the early elementary school grade range.  Upland considered the information Mother provided, asserting Student was in 10th grade following the general education high school curriculum, and was successfully completing the requirements for a regular high school diploma at a private school. Based on Mother's representations that were subject to confirmation by the private school transcript Mother agreed to obtain and provide to Upland, the IEP team considered the statutory continuum of placement options and determined the least restrictive environment in which Student was reasonably likely to make progress on the eleven IEP goals and three individualized transition plan goals.  The least restrictive environment was a blend of general education classes, collaboratively taught general education classes with specialized academic instruction, and special day program classes with specialized academic instruction.

Upland offered specialized academic instruction in a separate classroom at Upland High School, a public integrated facility, for three class periods a day for math

50

intervention, reading intervention, and a skills enhancement course.  The skills enhancement course was to focus on access to the core curriculum in the general education classes, through pre-teaching, re-teaching, and support with classwork completion from general education and collaboratively taught courses, but also to work on IEP goals and transition plan activities.  Upland offered specialized academic instruction in a regular general education classroom at Upland High co-taught by a general education teacher and a special education teacher, with a classroom aide, two periods a day for English and for science.  Upland offered the remainder of Student's classes, which could have included physical education, social science, and elective courses, in a general education classroom at Upland High.

Upland could not inform Mother on October 31, 2016, specifically which courses Student would be placed into because Upland needed to see Student's private school transcript to know which courses she had already completed.  For example, if Student had already taken Algebra, Student could be placed in Geometry.  But if she had not taken Algebra, she would have required that course before being placed into a course typical 10th graders take.  Also, if Student had already taken Biology, she could be placed in Chemistry.  But if she had not yet taken Biology, she would have required that course before being placed into other sciences.  Because Mother did not inform Upland what courses she provided Student at her homeschool and pretended she would obtain a transcript from Resurrection Academy, Upland did the best it could on October 31, 2016, to describe the placement environment it proposed for Student while still needing additional information Mother refused to share.  Had Upland been able to administer academic achievement tests to Student as part of the required triennial reassessment, or had Upland received truthful information of which Mother was personally aware, Upland could have developed a more specific course schedule proposal.

51

Upland offered related services to support Student obtaining educational benefit from her special education.  Upland offered Student 60 one-hour sessions of individual, pull-out speech therapy for the year, and 30 one-hour sessions of speech therapy in her classrooms for the year.  Upland offered 30 ten-minute occupational therapy consultation sessions with Student's classroom and school staff for the year.  Upland offered Student one 30-minute session of transition service on an individual basis. Upland also offered transportation for Student, and Mother requested Upland reimburse her for transporting Student to school.

## ISSUE 3A: CONSIDERATION OF AREAS OF NEED IN WHICH STUDENT HAD NOT BEEN ASSESSED, SPECIFICALLY POST-SECONDARY TRANSITION, CENTRAL AUDITORY PROCESSING, ATTENTION, AND THE NEED FOR ASSISTIVE TECHNOLOGY

Student complains Upland did not consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and assistive technology.  Upland denies it denied Student a FAPE.

The lack of assessment in each of these areas was due to Mother's conduct.  On September 30 and October 19, 2016, Upland provided Mother a triennial assessment plan that included post-secondary transition needs as an area for evaluation, but Mother had not consented.  Therefore, Upland had been unable to assess Student's current needs in post-secondary transition.  Upland developed a reasonable individual transition plan based on the information available to it as of October 31, 2016.

Upland attempted since March 2015 to obtain Mother's consent to assess Student's attention using the Test of Variables of Attention, and Mother repeatedly failed to sign written consent to Upland administering that assessment.  Had Mother

52

signed the September 30 or October 19, 2016 triennial evaluation assessment plan, Upland could have assessed Student's attention during its triennial reassessment. Instead, on October 20, 2016, Mother claimed she disagreed with unspecified assessments by Upland and requested an independent evaluation for the Test of Variables of Attention by Dr. Timothy Gunn.  The fact that attention as a suspected area of disability had not been assessed by Upland was due to Mother's lack of written consent on assessment plans Upland gave her in March, April, and July 2015, as well as the September 30 and October 19, 2016 triennial evaluation assessment plan. Therefore, Upland was unable to assess Student's attention.

Mother requested assessment for central auditory processing disorder and evaluation of Student's need for assistive technology on October 20, 2016.  She requested independent evaluations, but Upland had not previously assessed Student in these areas.  Accordingly, there was no assessment Mother disagreed with as the basis for obtaining independent evaluations at public expense.  (*T.P. v. Bryan County School Dist.* (11th Cir. 2015) 792 F.3d 1284, 1293 ["The parental right to an IEE is not an end in itself; rather it serves the purpose of furnishing parents with the independent expertise and information they need to confirm or disagree with an extant, school-district-conducted evaluation."]; see also *Schaffer v. Weast*, *supra*, 546 U.S. at p. 61 [stating that an IEE following parental disagreement with the school's evaluation is necessary to ensure that parents have a "realistic opportunity to access the necessary evidence" and are not left "without an expert with the firepower to match the opposition"].)

Upland immediately offered to have an audiologist assess Student for central auditory processing disorder and to have a speech-language pathologist assess Student's need for assistive technology.  Upland sent Mother an assessment plan for these two evaluations on October 27, 2016.  Mother did not consent to these assessments, and even if she had, there was not enough time before the October 31, 2016 IEP team meeting to conduct the assessments Mother requested 11 days before the IEP team meeting.

Despite the lack of assessment for assistive technology, Upland offered Student assistive technology in the October 31, 2016 IEP.  Mother requested a text-to-speech program called Kurzweil 3000 to read aloud to Student written information.  Upland offered Student that program as an aid, service, or support.  Upland also offered Student access to a computer, laptop, or iPad at school for written assignments, and the ability to dictate for written assignments.  Upland offered to allow Student to use an audio recorder and/or written instructions for information presented verbally.  Upland also offered Student a scribe to transfer answers when required, dictation, help with typing, and a speech-to-text program for classroom, district, and statewide testing. Therefore, Upland considered and addressed Student's need for assistive technology based upon Mother's request and the information available to it as of October 31, 2016.

Student did not meet her burden of proving Upland denied Student a FAPE in the October 31, 2016 IEP by failing to consider the specified areas of need in which Student had not been assessed.

## ISSUE 3B: INCLUSION OF PRESENT LEVELS OF PERFORMANCE IN ALL AREAS OF UNIQUE NEED

As stated above, Student's claim that Upland denied her a FAPE in the October 31, 2016 IEP by failing to include present levels of performance in all areas of unique need is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as Student's Second Case, so it was not preserved by the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any challenge to the development or content of the October 31, 2016 IEP was required to be filed within two years of the IEP team meeting at which it was developed.  Student failed to timely file a claim regarding inclusion of present levels of performance in all areas of unique need in the October 31, 2016 IEP.  Even assuming this issue relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018.  Therefore, as stated above, Issue 3b is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3C: DEVELOPMENT OF APPROPRIATE GOALS BASED ON PRESENT LEVELS OF PERFORMANCE

As stated above, Student's claim that Upland denied her a FAPE in the October 31, 2016 IEP by failing to develop appropriate goals based on present levels of performance is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as Student's Second Case, so it was not preserved by the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any challenge to the development or

content of the October 31, 2016 IEP was required to be filed within two years of the IEP

team meeting at which it was developed, by October 31, 2018.  Student failed to timely

file a claim regarding development of appropriate goals based on present levels of

performance in the October 31, 2016 IEP.  Even assuming this issue relates back to the

August 13, 2019 original filing date of Student's First Case, this claim is untimely

because it was not filed within the two-year statute of limitations, by October 31, 2018.

Therefore, as stated above, Issue 3c is dismissed as outside the statute of limitations and

not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3D: DISCUSSION OR CONSIDERATION OF PRIVATE SERVICES STUDENT WAS RECEIVING FROM LINDAMOOD-BELL, TUTORING, AND SPEECH THERAPY

To fulfill the goal of parental participation in the IEP process, the school district is

required to conduct a meaningful IEP meeting.  (*Target Range, supra,* 960 F.2d at

p. 1485.)  A parent has meaningfully participated in the development of an IEP when he

or she is informed of the child's problems, attends the IEP meeting, expresses

disagreement regarding the IEP team's conclusions, and requests revisions in the IEP.

(*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover*

*Board of Education* (3d Cir. 1993) 993 F.2d 1031, 1036 [parent who has an opportunity

to discuss a proposed IEP and whose concerns are considered by the IEP team has

participated in the IEP process in a meaningful way].)

### LINDAMOOD-BELL

At the time of the October 31, 2016 IEP team meeting, Student was receiving

services at Lindamood-Bell at Upland's expense under a prior settlement agreement.

During the October 31, 2016 IEP team meeting, Mother told Upland Student was

regularly going to Lindamood-Bell.  Upland inquired if Student could or would receive a high school diploma from Lindamood-Bell.  Mother reported Lindamood-Bell did not confer high school diplomas but some of the work or "classes" Student did at Lindamood-Bell could "transfer out," meaning Student would get credit for them at the private school.  Mother shared that Lindamood-Bell provided Student one-to-one support online when Student was not able to go to the Lindamood-Bell center in person.

Mother merely asserted to the IEP team Student made progress with Lindamood-Bell.  She but did not provide any specific information regarding what that progress looked like, how it reflected in Student's test scores, abilities, or progress in the general education curriculum toward earning a high school diploma.  Mother did not provide the IEP team with information that indicated the Lindamood-Bell services in any way raised Student's present levels of performance other than Mother's claim Lindamood-Bell said Student's comprehension was at the 10th grade level.

Mother told the IEP team the remaining funding on the Lindamood-Bell contract under the prior settlement agreement with Upland would provide Student only two more weeks of services.  Mother requested Upland offer Student continuing services at Lindamood-Bell.  After the IEP team discussed and proposed goals, the least restrictive environment in which Student could work on those goals and make progress toward her overall goal to earn a regular high school diploma, and related services necessary to enable Student to work on her goals and benefit from her special education, Upland determined Student did not require continuing services at Lindamood-Bell to receive educational benefit appropriate in light of her circumstances. Therefore, Upland did not offer Student ongoing services at Lindamood-Bell.

Mother did not want Student to attend a public school program and receive related services from Upland.  She rejected Upland's offer of placement and services and told the IEP team Student would remain enrolled in private school at Mother's expense.  Upland informed Mother of Student's right as a private school student to receive a proportional share of services through an individual services plan.  Mother stated she was not interested in an individual services plan for Student.

There was no evidence to support Student's assertion Upland failed, refused, or avoided discussion or consideration of Student continuing to receive services at Lindamood-Bell as part of her October 31, 2016 IEP.  Mother did not want Student to attend a public school program and receive from public providers any services designed to enable her to access her education.  Mother instead preferred Student to receive services from individuals and entities with whom Mother could privately contract.  The fact that Mother asked Upland to pay for services to Student by a private business did not require Upland to agree to pay for those private, outside services on top of the comprehensive public school and related services educational program Upland proposed.  In not offering what Mother wanted, Upland did not significantly impede Mother's opportunity to participate in the educational decisionmaking process.

TUTORING

With regard to failing to discuss or consider tutoring, Student's First Case alleged that during the IEP team meeting on October 31, 2016, Upland did not "hold a discussion" of "other related services [Student] was receiving" "provided by District."  During the June 15, 2020 prehearing conference, Student clarified the related services she meant were tutoring and speech therapy.  The evidence did not establish that as of October 31, 2016, Student was receiving "tutoring" from or paid for by Upland, whether directly or on a reimbursement basis.

58

The preponderance of the evidence established that the person from whom Student received "tutoring," Sydney Pacheco, was claimed by Mother as a "teacher" at Resurrection Academy in Mother's filing with the California Department of Education Private School Affidavit for the 2015-2016 and 2016-2017 school years and extended school years.  In October 2016, Pacheco was approximately 22 years old and had no teaching credential, training, or experience apart from spending time with Student. Pacheco never worked in a school in any manner, and never provided services to someone at a school.  At the time of hearing, she worked as a cashier at a crafting store and as an enumerator for the Census Bureau.  Although Pacheco claimed to have some college education, there was no evidence she had that education when she began tutoring Student or before she stopped tutoring Student in August 2018.  Starting in April 2014, Mother paid Pacheco $15.00 per hour to do activities with Student including stretching, worksheets, reading, and incorporating prayer into every topic.  Pacheco supervised Student inside Student's home approximately four hours per day, four to five days per week, sometimes on a weekend day, but averaging a total of 16 hours per week over four days.

At hearing, Pacheco claimed she was trained by Lindamood-Bell in some of their programs by video and in a three-day in-person course, about how to speak to a student, going over grammar, reading, English, and briefly on how to approach it by visualizing.  Pacheco used what she learned during her activities with Student to complete academic activities she and Mother agreed to have Student work on.  When shown Student's transcript at hearing, Pacheco had not seen it before.  She agreed she had worked with Student on topics listed on the transcript, like English, history, science, and math.  However, Pacheco admitted she was not aware of the grades Student received in those subjects, as stated on the transcript, because she did not determine Student's grades; Mother did.  Pacheco generically described specific content she